FILED

2020 Mar-06  PM 05:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MEGAN GOHN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE** |
| | ) | **NO.:  2:18-cv-00866-GMB** |
| **v.** | ) | |
| | ) | **Oral Argument Requested** |
| **EB, LLC d/b/a On Tap,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

From February 2014 to December 2016, Megan Gohn ("Gohn" or "Plaintiff") worked as a bartender at On Tap's Lakeview location. She was a good bartender, frequently earning over $100 in tips during her, primarily, night shifts. On Tap made Gohn a key holder who had to ensure customers left the bar at closing, cashing out at the completion of work, and clocking employees out.

Gohn used On Tap's state of the art Point of Sale ("POS") system to clock in and out for each shift and understood that the system kept a record of the hours she worked, which was used to determine her pay.  As a tipped employee, Gohn received $2.13 per hour as well as cash and credit cards tips from customers. As an experienced bartender and trained by On Tap, Gohn understood that she received a

1

tip credit as part of her wages but if she ever failed to make minimum wage, On Tap would pay the difference.  Gohn also knew that if she ever worked over forty hours in a work week, she would be entitled to overtime, and, on four different occasions, was paid overtime by On Tap.

Gohn says she was told in mid-July 2015, by a manager, Necole Stone ("Stone") that she had to clock out exactly at midnight or 2 AM, depending upon the day of the week, even though she had cleaning duties remaining.  Some eighteen months after her last day on December 21, 2016, Gohn sued On Tap claiming she followed the clock directive and worked off  the clock on nights she closed for over about 18 months before she quit. Based on that allegation, she now claims, despite the fact she was a tipped employee, entitlement to unpaid minimum wage of $7.25 per hour and unpaid overtime based upon her "guessestimate" that she worked 5 shifts a week, and due an hour for each of 52 weeks.

Stone denies instructing Gohn to work off the clock, saying she could have misunderstood the instruction to close the restaurant timely and leave after work was completed, instead of hanging around the bar with friends.  Gohn admits assuming many of the facts surrounding their conversation, time she worked and calculation of wages owed. Gohn never complained to any other manager at the restaurant, or in the corporate operation, about working off the clock, nor did any member of management suspect that she was.  Gohn regularly clocked in and out and was paid

accordingly.  She was also paid an additional flat fee of $50 or $70 for serving as the key holder on certain shifts.

On Tap has employed professionals to set up its books and assure the business is operated in conformity with state and federal laws, in particular wage and hour laws and regulations.  Gohn has no evidence to dispute On Tap's accurate time and pay records other than her hazy memory and unsupported accusations. For the reasons set forth more fully below, Defendant urges the Court to grant the Motion for Summary Judgment and dismiss Plaintiff's claims with prejudice.

## I.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. On Tap's Business and Tip Credit Model

1.  Craig and Elaine Beegle are corporate Co-Managers of EB, LLC d/b/a On Tap, which is owned by Fultondale On Tap, Inc. and operates a handful of pubs and restaurants near Birmingham, Alabama. Ex. 13 - C. Beegle Dec., p. 1.

2.  John Fath ("Fath") was a manager at the On Tap restaurants before they were purchased in 2006.  He was retained for his expertise and was a manager for a portion of the time Gohn was employed.  Ex. 13 - C. Beegle Dec., p. 1.

3.  Fath trained a number of managers, including Stone, who was the manager for most of the time Gohn worked at the Lakeview location. Ex. 12 - Fath Dec., p. 3.  Lloyd Shaw was also a manager at Lakeview for a few months when Stone was at the Fultondale location. Ex. 12 - Fath Dec., p.10; Ex. 9.

4.  On Tap employs a number of people in its restaurants, including kitchen staff, servers, bartenders, and managers. Ex. 12 - Fath Dec., p. 2. Many of the staff work for On Tap in conjunction with other jobs or while attending school; thus, no one regularly works over thirty-five hours a week. *Id.*, p. 3, ¶ A.

5.  During the relevant time period - July 2015 to December 2016 - Bartenders were paid $2.13 per hour plus any tips they made while working. Ex. 12 - Fath Dec., p. 4, ¶ C.[1] If a bartender failed to earn adequate tips to reach minimum wage - $7.25 per hour - On Tap would pay the difference. Ex. 14 - Gohn Dep., p. 55:3-7. This was to ensure compliance with the Fair Labor Standards Act ("FLSA"). Ex. 12 - Fath Dec., p. 4, ¶ C; *see* Ex. 15 - Stone Dep., 80:18-81:1. If a bartender worked over forty hours a week, they were entitled to overtime payments, including a base pay of $5.49 per hour. Ex. 12 -Fath Dec., p. 4, ¶ A; Ex. 14 - Gohn Dep., pp. 80:22-81:1. *See also* Ex. 1 - Gohn 2015 Time Sheet OTP00509; Ex. 2 - Gohn 2016 Time Sheet OTP 0037, OPT 0040 reflecting payment for overtime hours.

6.  All employees were assigned a specific number, which they entered to clock into the Aloha Point of Sale ("POS") system used by On Tap, when they started work, and to clock out when their shift ended. Ex. 12 - Fath Dec., p. 1-2. After

---

[1] Gohn testified she made $2.15 per hour at On Tap. Gohn Dep., p. 14:3-9. This was an error and likely caused because that is the hourly rate she currently makes at Good People Brewing. Ex. 14 - Gohn Dep., p. 8:5-6; Ex. 12 - Fath Dec. p. 4, ¶ C. *See also*  Ex. 10 - M. Gohn Answers to Interrogatories, No. 5.

clocking out, each employee automatically received a receipt from the POS, illustrating the employee's shift hours worked and tips earned, if applicable. *Id.* p. 5, ¶ D; Ex. 14 - Gohn Dep. pp. 62:7-14, 63:4-11. An example of a dummy receipt for illustrative purposes is attached to Ex. 12 - Fath Dec. as Ex. 6. It says: "This is verification for hours worked. Keep this for your records." *Id.*

7. Bartenders earned cash and credit card tips from the patrons they served at the bar as well as a percentage of the tips made by the servers. Ex. 15 - Stone Dep. 37:3-20; Ex. 14 - Gohn Dep. 92:6-17, 93:6-17. Typically, bartenders worked alone and would not share tips. Ex. 15 - Stone Dep. 34:10-14; Ex. 14 - Gohn Dep. 56:2-13. However, if the restaurant was particularly busy and two bartenders were working together, they would split their tips. Ex. 15 - Stone Dep. 34:10-14; Ex. 14 - Gohn Dep. 56:9-10. Bartenders never shared tips with kitchen staff or with managers. Ex. 14 - Gohn Dep. 51:16-7; Ex. 12 - Fath Dec. p. 4, ¶ C; Ex. 15 - Stone Dep. 36:13-14; Ex. 16 - Shaw Dep. 60:4-8 (agreeing "[t]he policy at the company was there was no sharing of the tips with nontipped employees")).

8. At the end of each shift, On Tap required bartenders and servers to declare the amount of tips received. Ex. 12 - Fath Dec., p. 4, ¶ C; Ex. 6. Gohn testified "declared tips" meant the amount she wanted to declare that day (Ex. 14 - Gohn Dep. 154:20-3), but she knew the figure was to include cash as well. Ex. 14 - Gohn Dep. 155:1-7. Tipped employees kept their cash tips and were trained to take cash from the

register drawer when cashing out in the amount of the credit card tips they earned. Ex. 14 - Gohn Dep. 58:15-9; Ex. 12 - Fath Dec., p. 4, ¶ C. "On Tap made the employee the owner of their own tips[.]" Ex. 12 - Fath Dec., p.4, ¶ C.

9. Management counselled each tipped employee on the tip credit system, and there is no dispute that Gohn and her colleagues understood how they would be paid. Ex. 14 - Gohn Dep. 55:1-13; Ex. 12 - Fath Dec., p. 5, ¶ C. Gohn admits the pay is "pretty much the same across the board." Ex. 14 - Gohn Dep., pp. 13:23-14:1-4 (referring to other bar-restaurants).

10. Moreover, each employee received a handbook explaining the tip credit system. Ex. 12 - Fath Dec., p. 5, ¶ C; *see* On Tap Employee Handbook, Ex. 5. The Handbook stated employees would receive a tip credit for any cash or credit card tips received and strongly encouraged employees to "accurately report [their] tip income." Ex. 5, p. 11. The Handbook also clarified that "employees are paid overtime when they work more than 40 hours in one week" at a rate "one and one-half times their basic straight time[.]" *Id.* p. 5. Gohn received overtime when earned. Ex. 1, pp. OTP0037, OTP0040.

11. "Management of On Tap posted the FLSA poster at Lakeview On Tap on the bulletin board all employees pass during the shift which also explained how the tip

credit worked, along with other legal rights of employees." Ex. 12 - Fath Dec., p. 5, ¶ C.

## B. On Tap's Point of Sale System

12. To ensure On Tap complied with the FLSA and kept adequate records, the company installed a state-of-the-art POS system in its restaurants. *Id.* p. 1.

13. Employees were responsible for clocking in and out of the POS with their assigned number, and tipped employees were responsible for declaring the tips they earned each shift. *Id.*, p. 2; 4, ¶ C.

14. Each employee was trained on how to use the POS, and to demonstrate their understanding, the staff was required to clock in and out at least once in front of a manager. *Id.*, p. 5, ¶ D.

15. On Tap provided the information accumulated in its POS to a third-party vendor – Payroll & Benefits Solutions, Inc. – which calculated payroll, including determining whether any employees were entitled to overtime pay or whether any tipped employees failed to earn sufficient tips to make minimum wage, and issued checks. *Id.*, p. 4, ¶ A; Ex. 13 - C. Beegle Dec., p. 2.  A true and correct copy of Gohn's Payroll History for 1/1/2014 through 10/14/2017 is Ex. 4. Ex. 12 - Fath Dec., p.4, ¶ A.

## C. On Tap's Clock Out Policy

16. On Sunday through Thursday nights at the Lakeview location, the shift began at 5:00 p.m. *Id.*, p. 4, ¶ A. The kitchen closed at 10:00 p.m., and last call for drinks occurred at 11:30 p.m.  *Id.* p. 5, ¶ G. The pub closed its doors to customers at midnight Sunday through Thursday, but the night shift ended when the employees finished cleaning and clocked out. *Id.*, p. 4, ¶ A; Ex. 15 - Stone Dep., p. 63:20-21. On Friday and Saturday nights, last call occurred at 1:30 a.m. and the bar closed at 2:00 a.m. Ex. 12 - Fath Dec., p. 4, ¶ A; Ex. 15 - Stone Dep., p. 44:8-13.  The only dead set rule was that the restaurant closes at 12 during the week and customers have to be out. Ex. 15 - Stone Dep., p. 23:9-16.

17. The servers and bartenders would start cleaning when business was slow or after last call. *Id.*, p. 6 ¶ G; Ex. 14 - Gohn Dep. pp. 87:4-88:13.  There would be some tasks left to do after closing, including sweeping, mopping the floors, and using bleach on the beer drains. *Id.*; Ex. 15 - Stone Dep. 24:9-25:21; Ex. 14 - Gohn Dep. p. 88:17-20. However, those cleaning duties would not take very long. Ex. 15 - Stone Dep. 25:13-16. On average the closing tasks, including counting tips, took about 30 minutes. Ex. 14 -Gohn Dep. pp. 90:14-91:5. This time was without pre-closing work.

18. After the staff finished cleaning, then counted their tips, did checkout, and then clocked out before leaving the restaurant and locking the doors. Ex. 12 - Fath Dec., p. 6, ¶ G. For managers and key holders, setting the alarm and leaving the building should be the only responsibilities remaining after clocking out. *Id.*

**D. Manager Reports and Edited Punches**

19. Managers, like Stone and Fath, were responsible for checking the staff's time sheets and tips from the previous day to ensure they were accurate. *Id.*, p. 2. The managers would compare the credit card receipts to the servers and bartenders' claimed tips to ensure no human errors occurred. Ex. 15 - Stone Dep. 41:4-11.  There would occasionally be calls from Elaine Beegle to advise of an employee's failure to clock out or imbalance in tips and a manager would make the corrections. Ex. 16 - Shaw Dep., p. 130:11-131:1, 132:23-133:15.

20. If an employee forgot to clock out before leaving the pub, then the POS would automatically clock them out at 3:30 a.m. Ex. 12 - Fath Dec., p. 2; Ex. 15 -Stone Dep., p. 39:10-23. The following day, the manager would call the employee to determine what time he or she actually finished working, review the camera to see when the employee left, or make an educated judgment from the sales information to correct the clock out time. Ex. 12 - Fath Dec., p. 2; Ex. 15 - Stone Dep., p. 40:16-22; Ex. 16 - Shaw Dep. 44:12-45:5. The Employee Handbook provides that falsifying time records is subject to disciplinary action up to termination. Ex. 5, p. OTP00527.

21. After-the-fact changes to an employee's timecard or tips are called "edited punches" and are tracked by the POS. Ex. 12 - Fath Dec., p. 2. Fath explained that

edited punches "would appear on the [POS] screen immediately when the employee clocked in for the next shift. That gave the employee an opportunity to see what had been edited and make any corrections or objections." *Id.* p. 5, ¶ D. The name of the person making the edit would appear next to the edited punch on the POS system's report. *Id.*, p. 7, ¶ L; *see* Ex. 3 - Redacted Edited Punches Report from 2/9/2014-10/14/2017 for Megan Gohn.

**E. Gohn's Employment with On Tap**

22. Gohn mainly worked for On Tap as a bartender at the Lakeview location from 2014 through December 2016. Ex. 14 - Gohn Dep. 78:5-7; 15:14-16:7. She was an experienced bartender, and frequently acted as the key holder during her shift, meaning she was like a "fill-in-manager." *Id.* 20:2-5.[2]

23. As a bartender, Gohn's responsibilities included, setting up the bar, making drinks for customers, cleaning the bar, and counting her drawer after close. Plaintiff's Response to Defendant EB, LLC's First Set of Interrogatories, Ex. 10 p. 2-3, No. 6. To fulfill her cleaning obligations at closing, Gohn would  "mop behind the bar, sweep the front side of the bar, wash bar mats, clean fruit and salt trays, wipe down the bar, put the bar stools on the back of the bar, stock beer and change kegs[.]"

---

[2] Stone was the longest serving manager when Gohn worked at Lakeview. *Id.* 29:12-15.

*Id.*  On average it would take her 30 minutes to do the cleaning. Ex. 14 - Gohn Dep.,
p. 90:14-91:5.

24. If Gohn was the key holder, she would also be responsible for taking the cash
drawer to the office, setting the alarm, and locking the building at the end of her
shift. Ex. 12 - Fath Dec., p. 5, ¶ G. As the key holder, she would assure all of the
side work was completed, clock out the kitchen employees and the servers at the end
of the night by following their input of the employee number with her own, and
making sure all money had been counted and turned in. Ex. 14 - Gohn Dep., p. 20:8-
13.

25. On Tap paid Gohn additional wages for being the key holder.  Ex. 14 -Gohn
Dep., p.144:7-12.   Exhibit 8 are copies of checks to Gohn for holding the key and a
handwritten index. Ex. 12 - Fath Dec., p. 9.  Gohn usually received $50.00 per shift
for holding the key, but she occasionally received $70.00 per shift.  *See* Ex. 8; Ex.
12 - Fath Dec., p. 6, ¶ H; Ex. 15 - Stone Dep., p.38:9-16 (The key was paid a flat
rate of $50.00 a shift.)

26. In 2015 and 2016, Gohn typically worked four or five days a week – Sunday
and Wednesday dayshifts, Monday, Tuesday and Thursday nights, and many Fridays
and Saturdays. Ex. 14 - Gohn Dep., pp.100:20-101:17.[3] Gohn also usually worked a

---

[3] The workweek was Sunday to Saturday.  *See* Exhibit 4.

Friday or Saturday, depending on the football games. *Id.* 104:22-105:5. On occasion, Gohn clocked shifts that were over eight hours; however, the vast majority of her shifts lasted between 6.5 and 7.5 hours. (*Id.*).[4] *See* Ex. 11 - Composite On Tap data of Gohn on 2015 & 2016 calendars and Ex. 18 - Dec. of L. Halloran regarding the composition, Ex. 1 - Gohn 2016 Time Sheets, Ex. 2 – Gohn 2015 Timesheets, Ex. 4 - Gohn Payroll Records and Ex. 8 - Key holder checks to M. Gohn.

## F.  Gohn Claims Stone Told Her To Clock Out At Closing

27. Gohn claims that Stone directed her to clock out at midnight (Ex. 14 -Gohn Dep., p. 64:10), did not say why but said it would make her life easier. *Id.*, p. 66:6-14. In response to a question, as to whether she asked if that meant she was supposed to work off the clock, Gohn testified: " She said to do our checkout first and finish cleaning when we had done our check out. We needed to (sic) clocked out at 12 if possible." Ex. 14 - Gohn Dep., p. 67:6-16.  Gohn testified she always counted her money and cashed out first, because that is the order she liked to do it (*Id.*, 176:2-9) and when you did that, the POS would prompt you to clock out so she did for fear of forgetting later. *Id.,* 63:20-64:2, 119:2-20.

---

[4] In November 2015, Gohn worked 17 shifts, and 4 shifts were longer than 8 hours. In February 2016, she worked 19 shifts, and 4 were over eight hours. In June of 2016, Ms. Gohn worked 20 shifts, and 4 were over eight hours. In October of 2016, Ms. Gohn clocked 20 shifts, and only one was over 8 hours.

28.  Stone said the customers had to leave at 12 and the door was locked, as the staff finished up whatever had to be done, counted their drawer and clocked out. Ex. 15 - Stone Dep., p. 32:5-10.  Gohn testified Stone told her: "She told us to clock out as soon as we could, as soon as we got our credit cards in, yes, that is my testimony." Ex. 14 - Gohn Dep., 176:10-15.

29. Gohn could not recall all that was said in the conversation but believed something had happened to prompt Stone to make the statement, because she had never said that before. *Id.*, pp. 66:15-67:5.  Caroline Seier, a friend of Gohn's and also a bartender, said she was in a meeting with Necole and Megan and Necole told them they must clock out at midnight whether or not there were still customers in the restaurant. Ex. 17 - Seier Dep., p. 57:19-58:2.

30.  Gohn believed she was being asked to work off the clock but did not complain to Stone or Craig or Elaine Beegle that Stone had told her to clock out at closing. Ex. 14 - Gohn Dep., p.78:10-13. She testified she assumed Craig and Elaine Beegle knew because Stone told her "… it came from them." *Id.* 79:89.   Gohn said she assumed Craig and Elaine Beegle told Stone to tell them to clock out at closing. "She said please clock out at midnight finish whatever you have to do, and go." *Id.* p. 79:23-80:1-2.

31. Stone said she may have been misunderstood when she instructed the staff to try to finish their duties quickly – pre-cleaning began at least by last call 30 minutes before closing – so most cleaning could be done. Ex. 15 - Stone Dep., p. 24:9-16. All of the restaurant except the bar area could be cleaned with chairs up so that by midnight when the customers were made to leave, there was very little left to do. *Id.,* p. 24:23-25:4.  She was telling the staff they needed to "hurry up and get your stuff done and clock out," Ex. 15 - Stone Dep., p. 27:3-7.

32.  On a few occasions Craig Beegle or Fath had viewed videos and asked what the staff was doing after 12 having beers with some regulars there. Ex. 15 - Stone Dep., pp. 26:21-27:2.  Because of these events, Stone had to "get strict about the out the door by 12 and make sure you clock out, you know, and don't sit around and drink beer with your friends and forget to clock out, you know, and then clock out later because I did get in trouble for that a couple of times." *Id.* 26:2-19.  She said she had to crack down and tell the staff they had to make everybody go outside: "They don't have to leave the patio, but they have to leave the bar, restaurant." *Id.,* 27:8-17.

### G.  Gohn Does Not Have Records To Show Time Off The Clock

33.  Gohn did not retain the time and tips receipts automatically generated for each shift to show the days she worked off the clock, Ex. 14 - Gohn Dep., p.70:15-22, or any other records. *Id.* 76:17-21. She threw them away "immediately." *Id.* 69:6-

7.  She was working a lot and it did not cross her mind to keep records of the time off the clock. *Id.* 81:8-17, 96:2-6.  Gohn does not know if Stone ever sent her a text confirming she was to clock out and do cleaning tasks off the clock. She probably also did not confirm the direction by text. *Id.,* 96:7-14

34. Gohn relied only on her memory to dispute On Tap's POS time records. Gohn Dep. 108:21-109:2.[5]  She guesses she worked off the clock 5 hours a week. *Id.,* 184:14-185:9.

35. At deposition, Gohn speculated that she worked thirty minutes to an hour longer than the time she clocked out, following every shift she worked beginning in July 2015. (*Id.* 85:2-4). Gohn agreed that she was making a "guesstimate" of what she believed she was owed. *Id.* 85:19-22.  But she claimed to use the On Tap Time Sheets to come up with about $1,820 in lost wages by estimating a loss of 5 hours for each of 52 weeks. *Id.* 188:3-16.  She felt like she "was nice by saying $1200 instead of $1800." *Id.* 191:12-13.  Her calculation for unpaid wages did not include any tip credit arising from hours worked in the shift, *Id.* 204:7-17, nor key holder pay. *Id.* 127:1-5; *but see* 143:14-144:16 (key holder covered arriving early to hold key).

---

[5] However, at deposition, Gohn could not even remember the total tips she made the night before. Ex. 14 - Gohn Dep. 117:21-22.

36. Gohn did not use the Time Sheets provided by Defendant to come up with her estimation of time worked off the clock but relied on her memory of working 5 to 6 days a week and "normally closed most of those." *Id.* 98:6-17.  Gohn agrees, if indirectly, the On Tap time records are correct. *Id.,* 85:5-10, 102:19-103:1, 109:3-9, 152:1-8.

37.  If Gohn was only earning minimum wage working at On Tap, she would have quit to work elsewhere. *Id.* 206:3-7 (testifying, "I'm not going to work for minimum wage, I wouldn't do that[.] I would go work somewhere else").

38. Shaw testified at the time of deposition he worked at McInnis Construction. Ex. 16-Shaw Dep., pp. 11:21-12:1.  He said he started the job in October 2016. *Id.* 12:17-13:4.  He also testified he was a manager for McInnis over 15 to 20 "different people." *Id.* 13:9-14.  Shaw's personnel records from McInnis were subpoenaed and are attached as Ex. 16A and reflect he applied to be a laborer in February 2019.

## II.     ARGUMENT AND CITATION TO AUTHORITY

### A. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute over a material fact, and thus, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988). Summary judgment is mandated "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp*., 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co*., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51); *Lopez-Easterling v. Charter Communications, LLC*, No. 2:14-cv-01493 (N.D. Ala. Mar. 9. 2016). While the evidence must be viewed so as to allow all reasonable inferences in favor of the non-moving party, (*Anderson,* 477 U.S. at 255), more than a mere scintilla of evidence is necessary to survive a motion for summary judgment; "there must be a substantial conflict in evidence to support a jury question." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).

### B.   FLSA Requires Payment of Minimum and Overtime Wages

#### 1. Generally

An employer who "suffers or permits" an employee engaged in commerce is obligated to pay a minimum wage of $7.25 per hour of work for each workweek. 29 U.S.C. § 206(a)(1)(C).  The employer must pay one and half times the employee's regular rate for each hour worked over 40 in a workweek. 29 U.S.C. § 207(a)(1).

#### 2. "Tipped Employees"

When extending FLSA coverage to employees in restaurants and hotels, Congress enacted a "tip credit" provision accommodating the long- standing practice

in the service industry, which allows workers to receive most or even all of their income by customer tips. *See* Pub. L. No. 89-601, §§101(a), 201(a), 80 Stat. 830 (1966). The tip credit allows employers to pay a base rate of $2.13 per hour and use tips of employees to make up the minimum wage.  The FLSA[6] creates for "tipped employees," an exception to the minimum wage stating in pertinent part:

> In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to (1) the cash wage paid such employee which for purposes of such determination shall not be less than the cash wage required to be paid an employee on August 20, 1996 [$2.13 per hour]; and (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the [federal minimum] wage in effect under section 6(a)(1).

29 U.S.C. § 203(m)(2)(A). To qualify for a tip credit under this Section, the employer must establish: "(1) the tip credit is claimed for qualified tipped employees; (2) the employees received proper notice of § 203(m)(10(A); and (3) all tips received by the employees were retained by them, except when the employee participates in a valid tip pool with other customarily tipped employees." *Miller v. Spence,* No. CV. 14-00468-CG-B, 2015 WL 1862941, at *7 (S.D. Ala. Apr. 22, 2015).

Gohn does not make the claim that she was not a "tipped employee" as defined at 29 U.S.C. §203(t)(". . . customarily and regularly receives more than $30 a month

---

[6] Alabama does not have its own tip and wage laws, and thus Alabama employers must follow the federal tip credit rules.

in tips"). This status allowed On Tap to take a tip credit for the hours she worked as a 'tipped employee." 29 C.F.R. § 531.59(b).  There is no dispute that time spent, after the restaurant closed, cleaning the bar, placing stoppers in the bottles, cleaning the floor behind the  bar, re-stocking the beer, cleaning and stacking chairs on bar tables constituted tipped employment, or what Gohn referred to as "side work," (Ex. 14-Gohn Dep., p. 20:8-13) which falls within the meaning of "related work" in DOL regulations. *See* U.S. Dep't of Labor, Field Operations Handbook § 30d00(f)(Nov. 17, 2016)(hereafter "FOH § 30d00(f)".[7]

Under the FLSA, an employee may be paid $2.13 an hour so long as the difference between this wage and the minimum wage is covered by tips. 29 U.S.C. § 203(m)(2)(A). The base wage of $2.13 must be paid "free and clear[,]" and the employee's wage may not provide a "kick-back directly or indirectly to the employer or to another person for the employer's benefit[.]" 29 C.F.R. § 531.35.

### C.     Gohn Fails To Make A Prima Facie Case of Uncompensated Work

1.     Elements of a Prima Facie Case and Burdens of Proof

In order to prevail on her claim, Gohn must prove she worked without compensation and On Tap knew or should have known that she did.  *Allen v. Bd. of Pub. Educ. for Bibb Cty.,* 495 F. 3d 1306, 1314 (11th Cir. 2007).  The nature of the

---

[7] https://www.dol.gov/whd/FOH/FOH_Ch30.pdf

work, nor whether it was requested, is irrelevant to the duty to compensate. However, the employee must prove the employer has "suffer[ed] or permit[ed]"[8] (§203(g)) the work by showing the employer knew or should have known of the uncompensated hours. *Id.* If a plaintiff satisfies this burden, the employer "must bring forth either evidence of the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Allen,* 495 F.3d at 1316 quoting *Anderson,* 328 U.S. at 687-88, 66 S. Ct. at 1187.  If the plaintiff meets this evidentiary threshold, the burden shifts to the employer to show by accurate records what the correct work was, or negate plaintiff's evidence.

The employer is required to maintain accurate records of employee work time. 29 U.S.C. §211(c).  The *Allen* court quoted from the principal case on the subject at hand, *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946): "It is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment. *Id.* The employer is in a superior position to know and produce the most probative facts concerning the nature and amount of work performed and "[e]mployees seldom keep such records themselves." *Allen*, 495 F. 3d at 1315.

---

[8] *See* 29 C.F.R. § 785.11: "Work not requested but suffered or permitted is work time."

Where an employer failed to keep accurate records, or they are found to be untrustworthy,[9] the Supreme Court held: "'that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'. . ." *Allen,* 495 F.3d at 1316 quoting *Anderson*, 328 U.S. at 687-88, 66 S. Ct. at 1187.  Gohn relies upon this relaxed burden in this case.

2.    Gohn Admits To and Cannot Disavow Accuracy of On Tap Records

Gohn admits the Time Sheets are correct as to the shifts she worked. Ex. 14-Gohn Dep., p. 102:19-103:2. She does not dispute the clock out time is the correct time she clocked out; she disputes each clock out time on the nights she closed, as key holder, as being incorrect because she was told to clock out at midnight regardless of what had to be done. Her Time Sheets and Ex. 11 derived from them, do not support this claim. Fath's Declaration is undisputed. The records cannot be changed after three days. The validity of the POS is not disputed.  Gohn's only attack on the records is, in violation of the Employee Handbook directive, she did not put in the correct end of work time. And she did so without question or complaint.

---

[9] Deposition testimony showed supervisors in *Allen* told employees not to record overtime as it would not be counted, removed overtime hours, and at least once whited out overtime hours. *Allen*, 495 F. 3d at 1316. *See Lopez-Easterling v. Charter Communications, LLC*, No. 2:14-cv-01493 (N.D. Ala. Mar. 9. 2016); *Perez v. Palermo Seafood, Inc.,* 548 F. Supp. 2d 1340, 1347 (S.D. Fla. 2008)(Employer paid cash and kept no records and later only partial records).

On Tap has kept accurate records of the hours Gohn worked. On Tap purchased and installed a reliable POS system in its restaurants so that employees can track the time they work to the second. (Fath Dec, p. 1-2). Employees are trained that they must properly enter their time to account for the hours they have worked. Indeed, employees must prove their understanding of the system by clocking in and out in front of a manager. Gohn understood the importance of entering her time and that her pay was tied to the hours of work she performed.

Gohn relied only on her unreliable memory to dispute On Tap's accurate time records. Gohn Dep. 108:21-109:2. Instead, she guessed and assumed what she believed she did and was owed. *Id.* 85:19-22. Not even once did Gohn say she was estimating the times she worked off the clock. [10]Gohn claims that she started clocking out at closing time and finished her cleaning tasks off the clock in July 2015. But the empirical evidence does not support her testimony. Before July 2015, Gohn clocked out over ten minutes after closing time almost 50% of the shifts she worked as a bartender (45 out of 93 shifts). *See* Ex. 1 & 11 at 1/4/2015-7/1/2015. In the six months following the alleged instruction by Stone, Gohn clocked out over ten minutes after closing time roughly 40% of the shifts she worked as a bartender (40 out of 106 shifts). *See* Ex. 1 & 11 at 7/1/2015-12/31/2015. Thus, her behavior

---

[10] "Estimate" here means "an approximate calculation."  Pocket Oxford English Dictionary 9th ed. p. 305.

did not significantly change. She continued to clock out twenty to thirty minutes after closing in some instances.[11] Gohn never complained to management about working off the clock, and she admitted that she would have quit to work elsewhere if she was only making minimum wage. Ex. 14-Gohn Dep., p. 206:3-7. Therefore, she has failed to meet her burden to demonstrate that On Tap's records were inaccurate, and she cannot support by competent evidence the alleged number of uncompensated hours and claimed wages.

The Gohn Pay Register – Exhibit 4 – reflects the payments made to Gohn while she worked at On Tap.  The third-party vendor relied upon the time submitted by Gohn to create the payments she received, there is no dispute the pay represented there does not include all cash tips and key holder payments made to her.  In order to determine any back wages, the regular workweek rate will have to be calculated from all compensation paid in a week, and then applied to any alleged shortage. *See Perez,* 548 F. Supp.2d at 1349.  Gohn has not shown this calculation to prove there is uncompensated time.  The following sample from the workweek of September 6, 7, 10 and 12, 2015 as shown in Exhibits 1, and 11 is illustrative.  Gohn was a key on

---

[11] For example, on December 17, 2015, Ms. Gohn clocked out 20 minutes after closing. On December 19, 2015, she clocked out 22 minutes after closing. On December 20, 2015, she clocked out at 19 minutes after closing, and on December 21, 2015, Ms. Gohn clocked out 35 minutes after closing. On December 23, Ms. Gohn clocked out 29 minutes after closing, and finally, on December 26, 2015, she clocked out 49 minutes after closing.

Monday, September 6th but not the remaining days. She worked a total of 31.46 hours for which she was paid $2.13, and paid $70 on Monday as the key, and had tips of $304.88 for a total of $441.89 and divided by 31.46 hours results in an hourly pay of $14.05.  This week is reflective of those in which she held the key for closing, the shifts, by her testimony, she worked off the clock.  The week of July 3, 2016, Gohn held the key all of the 4 days she worked and not one night clocked out at midnight. Ex. 11 at July 2016.

An analysis of Ex. 11 calendars reveals July 2015 has no events where Gohn was on the clock for an extended time after closing which would prompt any comment about timely clocking out.  The only time found where such a time occurred is July 24, 2016 – her birthday.  There was no discovery by Gohn to try to identify any financial reason a directive to clock out at midnight would suddenly be given, despite a clear investment in the POS that provided accurate work time if used.

3.   There Is No Probative Evidence To Support Uncompensated Work

There is no dispute Gohn was paid at least $2.13 per hour and overtime for clocked work, and she understood that it was her responsibility to accurately log her hours in the POS and to declare her tips. Ex. 14 - Gohn Dep. 55:8-10; 106:21-23. She knew that On Tap would pay up to minimum wage if she failed to cover $7.25 an hour in tips.  For Megan Gohn, an experienced bartender, that was never an issue.

But, her claim that she was told to "work off the clock" is not supported by probative evidence.

The claim rests on Gohn's sketchy memory of a conversation with her manager, Stone in mid-July 2015.  Stone admits she admonished the staff to move along the cleaning and closing tasks in order to clock out as soon as possible and not tarry or allow customers to remain in the restaurant past the closing time. Stone had been questioned about staff and customers remaining after midnight.  Yet, the conversation she relays in deposition is that Stone, who had never given such a directive before, indicating it was not a company policy, said they: "needed to be clocked out by midnight," and to clock out at midnight "if possible," because it would "make her life easier." Gohn assumed something had happened, such as people staying past closing, and assumed the direction came from Craig and Elaine Beegle.

No reasonable inference can be had from the largely "assumed" testimony of Gohn. *See, e.g.,* (1) admitted she assumed many of the underlying facts surrounding the conversation with Stone. Gohn Dep. 66:15-19 (stating, "I don't remember exactly what she said. I assumed things, but I don't know exactly what happened for that to come up"; (2) to the same effect agreeing, "I'm assuming, I don't know this as a 100 percent fact, but [the Beegles] told [Necole] to tell us this" *id.* 79:21-23; (3) claiming she worked off the clock during a day shift and then stating "I'm assuming

that" *id.* 164:16-165:3; (4) agreeing that she assumed she did not clock out at closing time, as Stone allegedly directed, because she was waiting for customers to close their tabs *id.* 165:22-166:5; (5) guessing when and how often she worked off the clock. *Id.* 163:11,166:19-20, 184:18-22, 185:4-9.

Gohn asked Caroline Seier[12] "if it happened to [her]," when she asked her to be a witness, yet Seier claims she was in the meeting with Gohn and Stone. Despite their friendship, Seier does not remember if they talked about a directive to work off the clock when it was given.  Neither of their Timesheets show a consistent pattern after mid-July 2015 of clocking out at midnight on week-days and 2 a.m. on Friday and Saturdays.  *Compare*  Ex. 1 and 11 *with*  Ex. 17A-Seier  On Tap Time Sheets. They both allowed customers to remain in the restaurant after midnight as they were finishing their beers – the very circumstance Stone had addressed with the admonition about timely clocking out.  Shaw's Declaration -Ex. 19 - about meeting with Stone was contradicted by his deposition testimony Craig Beegle talked to Stone, Gohn and himself in 2016 about employees clocking out on time 2- 3 weeks before he left work at the Lakeview pub.[13]

---

[12] Gohn hired Seier's Uncle, an attorney, shortly after she quit to send a letter of complaint to Craig Beegle about On Tap issuing a 1099 for the key payments for 2016 tax year. Ex. 14-Gohn Dep., pp.110:22-111:22.

[13] This was only one of many contradictions. Shaw did not type the Declaration but printed and signed it and Ms. Gohn picked it up from him when he was working in the field on the construction job. Ex. 16 - Shaw Dep., pp. 168:21-170:5. *See* ¶ 38, p. 16, *supra*.  In light of the clear dissembling in Ex. 16 at 11:20-13:19 (McInnis); 15:15-19 (UAB); 72:13-20, 74:17-19, 74:13-75:1 (resume), Shaw's testimony should not be credited in any respect.

There is no dispute clocking out of the POS prevents a bartender from making a sale, or inputting credit card tips. While Gohn says she performed this task before cleaning, she described her duties as a key holder, when she closed, included approving other employees' side work before clocking them out and then herself. Employees were not doing the side work off of the clock.  This is a material fact that supports On Tap's contention no employees worked off the clock.

Providing random assumptions and repeating the same complaint over again does not create a genuine dispute of material fact, nor serve to establish the first prong of Gohn's prima facie case.

    2.    <u>The Claim of Working Off the Clock Is Unreasonable and Illogical</u>

Gohn did not know why Stone would tell her to clock out at midnight but thought it could be to save labor costs or avoid overtime.  Likewise, Seier claims she was in the meeting and told to clock out at midnight by Stone who said the "Beegles" said to tell them but did not know why, nor did she ask. Ex. 17- Seier Dep., pp. 60:13-61:17. At an average of 30 minutes over per closing shift, a labor savings would amount to $1.065. A claim of reducing labor costs by shaving a tipped employee's base wage is illogical and does not afford a basis for a reasonable inference there was a clear directive by On Tap to work off the clock.

Stone knew the focus of labor costs was on the kitchen workers; she managed overtime with scheduling, not suppression of hours by work off the clock, which has

prompted similar claims but on different facts. *See, e.g., Gilbert v. City of Miami Gardens,* No. 14-15432 *8 (11th Cir. Aug. 19, 2015)(employee ordered not to submit overtime but obvious to office she worked OT); *P& K Restaurant Enterprises, LLC v. Jackson,* No. 18-10673 (11th Cir. Jan. 15,2019) (P&K operated cash business without time clock or tax documents); *Perez,* 548 F. Supp. 2d at 1348(some time cards illegible, others reflected erratic hours); *Crosby v. Stage Stores, Inc.,* 348 F. Supp. 3d 742 (M.D. Tenn. 2018)(time logs altered).

But Gohn believed doing the side, or non-tipped work, could "pop" the hourly rate back into a non-tipped employee minimum wage. Because those are related duties, there is no reversion, for a tipped employee during non-tipped work, to a higher base wage. *See* FOH § 30d00(f) discussed in *Thomas v. Bayou Fox, Inc.,* No. 1:15-cv-623 ** 4-5 (M.D. Ala. May 31, 2017).

A review of Ex. 7- Composite of Hourly Sales for Gohn during her work life at On Tap, shows the days when there were customers to interfere with pre-closing cleaning which shows her assumption about when she clocked out after 12 are not valid. Based upon the testimony of Stone and Gohn, the kitchen workers were released and then servers who were not able to make tip money on slow nights. At that point any labor costs were negligible. Besides the $2.13 per hour for Gohn and the server who remained with her, the most exposure to labor costs was the $5.12 for each that might be necessary to meet the minimum wage <u>if</u> they had not received

sufficient tips.  Of course, if Gohn worked off the clock in violation of the FLSA, it does not matter what amount was not paid – it is still wrong. But, as an example, when asked about July 24, 2016 (Sunday),[14] Gohn said she did not clock out until 12:55 a.m. because it was her birthday and "was sure everyone was drinking and she was waiting on credit card tips." Ex. 14 – Gohn Dep. p. 168:13-169:3. *But see* Ex. 7 – OTP000166 which shows Gohn had 1 customer at 11 and 3 at 12 with net sales of $ 23.37.  She was celebrating and cleaning while on the clock.

The bald claim and evidentially unsupported assumption, that every night she closed was one she worked off the clock, is not born out by any competent, much less, substantial evidence.  When confronted with the reality there was no consistent clocking out at midnight after mid-July 2015, that differed from the historical record, Gohn altered the story from having to clock out at midnight to making excuses for why her clock out time on her Time Sheets are not all at midnight.  To say "I was probably" doing this or that to justify inconvenient and inconsistent material facts defies a "just and reasonable inference."

The overtime claim is based upon a hope with the "guesstimate," that she worked 5 hours off the clock each week between mid-July 2016 and December 21, 2016, that some weeks will thereby reflect over 40 hours.  Gohn has not reviewed the Time Sheets she was provided to identify what weeks she claims she is owed

---

[14] *See* Exhibits 11 and 18 – calendars prepared from Gohn records from On Tap POS.

wages. The calendars in Ex. 11 allow a clearer picture of her work history at On Tap. For instance, *compare* November 2015 *with* November 2016 and January 2016 with September 2016. The days off and change in Sunday schedule from night to day, among other factors presented herein, belie uncompensated work on the theory of 5 hours a week on shifts she closed with the key.  This claim is similar to one of the employees (others were able to show egregious time alterations to suppress overtime) in *Murray v. Birmingham Bd. of Educ.*, 172 F. Supp. 3d 1225, 1246 (N.D. Ala. 2016), *dismissed*, No. 16-16924-AA, 2017 WL 5485447 (11th Cir. Mar. 24, 2017) (granting Defendant's Motion for Summary Judgment and finding an employee only worked straight time when, despite claims of working off the clock, the employee was only working seven hour days, five days a week).  No overtime compensation is owed.

### D.    On Tap Did Not Know About The Alleged off the Clock Work

On the nights she closed and held the key, there was not a manager present, warranting the additional $50 or $70 Gohn was paid.  Even when Stone worked into the nightshift at times, she often left before closing.  Gohn says it was these nights she would work off the clock because of the directive to clock out at 12.   If she and the server were the last ones to clock out, there was no manager present to learn about any alleged off the clock work.  The manager reports the following day from

the POS would reflect a clock out time for Gohn that appeared reasonable in light of its proximity to closing time, and not raise any concern that something was amiss.

Gohn did not complain to Craig or Elaine Beegle about clocking out at midnight and only assumed they knew she was doing that <u>and</u> working off the clock. She never complained of not being able to get her work done to clock out at midnight. Gohn is "very good" at what she does and On Tap relied upon her work, including communication about any problems. She made calls often during shifts to Stone in her absence.

Craig Beegle did not work in the daily operations of the restaurants but let the managers handle them. Ex. 13-C. Beegle Dec. On Tap has a policy prohibiting managers from working off the clock. *Id.* at 3. He nor his wife had any indication Gohn, or any other employee, worked off the clock. *Id.* On Tap through its Handbook, training, POS, and third-party professionals made clear its policy of compensating employees for all work. The Lakeview restaurant was not suffering financially and On Tap did not need a tipped employee to work off the clock. Gohn was one of the company's best bartenders who could, as she well knew, go anywhere in town and get a job. Asking her to work off the clock would have likely caused a financial loss.

Gohn cannot show any probative evidence that On Tap knew she was allegedly working off the clock. Recognizing she submits her testimony as sufficient

to overcome a dispositive motion, On Tap contends the claim she was directed to clock out at midnight, and finish cleaning, is not notice that she, as closing bartender, clocked out at midnight, and she did not.  *See* Ex. 1, 2, 7, and 11.

## CONCLUSION

For the forgoing reasons, Gohn has failed to establish any reliable evidence that she is entitled to unpaid minimum or overtime wages. Instead, On Tap has maintained adequate records showing Gohn's claims are not consistent with a claim of clocking out at midnight. Additionally, Gohn did not consider the key payments as compensation paid during the workweek in her calculation.  Gohn rarely worked over forty hours a week, but those instances where she did, Gohn was paid overtime. Accordingly, On Tap urges the Court to GRANT the Motion for Summary Judgment.

*/s/ Marion F. Walker*
Marion F. Walker
ASB-0734-L73M
**FISHER PHILLIPS LLP**
2323 2nd Avenue North
Birmingham, AL 35203
Email: mfw@mfwalkerlawgroup.com
Telephone: (205) 327-8354
Facsimile: (205) 718-7607

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 6th day of March, 2020, a copy of the foregoing ***Defendant's Brief in Support of Its Motion for Summary Judgment*** was filed with the Clerk of Court through the Court's CM/ECF system, which will automatically service notice of such filing upon the following counsel of record:

Darrell L. Cartwright
Cartwright Law Center, LLC
P.O. Box 383204
Birmingham, AL  35238
Phone (205) 222-5900
Fax (205) 719-4020
DCartwright@gmail.com

Jeremy Schatz
The Patton Law Firm
3720 4th Avenue South
Birmingham, AL  35222
jschatz@thepattonfirmal.com

/s/ Marion F. Walker
Of Counsel